Good morning. May it please the Court, Ryan Downer for Appellants Mark Silguero and Amy Wolfe. The key question before the Court is whether plasma banks are beyond the reach of Title III of the ADA and therefore entirely free to discriminate against people with disabilities. The answer is no. Plasma banks, which are open to the public and provide benefits to the public, are covered public accommodations because they are service establishments within the meaning of the Act. This is so for two basic reasons. First, the plain meaning of service establishment is broad enough to encompass plasma banks. And second, the context requires that those words be given their natural, broad construction. As to the first reason, plasma banks like CSLs are clearly establishments and they provide services within the ordinary, common understanding of that word. This Court, sitting en banc, has twice looked to the dictionary to define the word service expansively. It's been held to mean an act done for the benefit of or at the command of another. It's also been held to mean a bargain for or anticipated provision of labor from one party to another. Other definitions include useful labor or helpful activity. A service establishment, then— But they're not—oh, go ahead. The establishment is not providing a service to the person who comes in to donate plasma, though. The person donating the plasma is providing a service. Can you help with that? Absolutely, Your Honor. I don't believe that to be the case. The service being provided to the customer who comes in to give his plasma is one of value creation. But they're not actual customers. They are customers because they are taking advantage of the services and activities that are provided by a plasma bank. Fundamentally, what's happening is that person, the donor, as they're called, are coming in to convert something with no market value into an asset that's transferable. And then the plasma bank allows them to essentially bring that asset to market and cash in on the value of their plasma. Okay, I mean, I have some real problems with how you're characterizing plasma because it's just—  There are aspects to this that are very different from just making widgets at the factory and selling those. And so, yes, they are taking something from the people that come in and paying them for it. But how is that a service? It's not a massage. It's not cleaning up your house. It's receiving something that is needed in the world. We need this plasma because people need plasma when they come to hospitals. And you're being paid for your trouble in coming in to do that. How is that a service? Because in order for that process to take place, the plasma bank must administer the service of evaluation and plasma extraction. And fundamentally, you as the donor are doing something that you want to do. But it's not a service to you. It's a service to the person who gets the plasma that I don't get— If I have to go to the hospital, I don't get plasma infected with whatever. I don't know the degree to which plasma versus pure blood is the same thing. But let's just go with me. I don't get HIV from the plasma. I don't know if you can. But let's just assume, arguendo, that you can. That's the service. But the service is, to me, the ultimate recipient, not the person that came in. The person that came in is not benefited by your filtering or CSL's filtering of the plasma. They absolutely do receive a benefit. And Title III's overarching concern is about making any facility that's open to the public and provide benefits to the public available to people with disabilities on an equal basis. You're benefited because you have something that is valueless to you, essentially. And because you went to the plasma bank, you're able to redeem a value. That's no different than a recycling center or a pawn shop or a consignment shop where you take objects that you don't have use for. Well, the difference is that when I pawn my ring, it's not going to be injected into somebody. The beneficiary on the other side is also receiving a benefit. There's no mistake about that. But that's really no different than if I ask a lawyer to draft a will for me and leave my estate to my son, my beneficiary, then he's receiving a benefit, but I've also received the service. And in this analogy, in this context of the plasma bank, the donor is receiving the service of having his plasma extracted, being evaluated. This process has all the indicia of a medical procedure. If it occurred in a doctor's office and, theoretically, you could take the plasma that's been extracted, take it down the block, and sell it, that would be a service that the doctor had provided to you that's covered. So when the person comes in and so if my sister needs a kidney and I come in to give her my kidney, they're providing a service to me by taking my kidney? I think the better analogy would be a fertility clinic where someone wants to sell their eggs. And in order to make that happen, the person has to go and receive a medical service so that they can then take advantage and be benefited. The person donating the kidney in your example ultimately wants to do that and needs assistance to do that, and that's fundamentally what a service is by the definition that this court adopted a service from the dictionary in Frambee City of Arlington. It's merely an act done at the command of another. But, I mean, somebody wants to clean my house and make money. I don't think I'm providing them a service. They're providing me a service. So I guess I don't understand. I mean, any transaction between two people you could see as a service because we interacted and I felt better because we interacted, but I don't know that like right now you're providing a service to me. The limiting principle here, Your Honor, is that in order to be covered by Title III, it has to be an establishment. No, I mean, I understand my house isn't hopefully not an establishment. But still, I mean, what I'm saying is you can take any interaction among people that both people feel beneficial and say, well, that's a service because you benefited me by going to the restaurant with me or going to the movies with me or whatever because then I didn't have to go alone. I mean, I don't view that as providing a service. Your Honor, the CSL regards it as providing a service, and they advertise that online to the public when they're not trying to avoid Title III liability. They also represent it to the federal government, to the United States Trade and Patent Office, which we cite in the briefs. They say they provide medical services, medical testing and screening services, and blood bank services. But to whom? To the donor. The screening services and the testing services are to the donor. So you're saying that by virtue of the fact that in order for the plasma to be of any value, they have to screen it, that's a service to the person giving it, period and a story. It is a service to the person giving it. It may also be a service to the person receiving it. But looking at both sides of the transaction, Title III covers the person coming into the establishment, a member of the public, to receive that benefit. And the service is fundamentally a helpful activity. It's assisting somebody. It's beneficial conduct. These are all things that happen in a plasma bank because if I, Mr. Soguero, my client, fell on hard times and needed to supplement his income, he had a need to find a way to do that, and he had something at his disposal that would allow him to do that, and that was his blood plasma, which he uses and many other people use to supplement their income. The paralyzed veteran brief talks about that as well, that their constituents would be affected by a ruling saying that these are not service establishments because they rely on plasma banks in order to help them supplement their income. I mean, it's to the plasma bank's benefit, if you will, to be open to as many people as are available if they want a lot of plasma. So that would be sort of contrary to your point that somehow this is going to close off everybody. Your point is more that if they have a policy that we don't want people that are under stress to the point of needing a comfort animal or a service animal of that sort to give plasma because we feel that that will be a problem, that that's not acceptable. That's really where you're at on this. We're at the threshold issue because that's what the district court decided, which is does Title III apply at all? The ruling from the district court would allow CSL to literally exclude anyone with a disability for any reason or no reason at all. If there are particular reasons based on actual evidence and reasonable medical judgment that someone with a disability should be excluded, Title III already allows for that exclusion. Do you need reasonable medical judgment to exclude someone from the service establishment if it were a service establishment? Or can you just have general policies that things that might disrupt can be, if you believe people might be disruptive, I'm asking. Do you actually have to have medical judgment? Well, if you're making an assessment that someone poses a risk to the safety of the organization or the entity, the law says you have to have a legitimate actual basis based on medical evidence for that. Do you have to have medical evidence under that? The Supreme Court in Bragdon v. Abbott said if you're making a safety exception, you have to have actual objective medical evidence, which there wasn't in the statute. Okay, so your reasoning that we can't affirm on the other ground is that there's no medical evidence in the record, is that correct? That's correct. And I have one more question, please. Mike, I want to ask you about the Texas Human Resources Code. Yes, Your Honor. You're suing also on that. Yes, Your Honor. That's a different, there's different language there. Should we certify that question to the Texas Supreme Court? I don't believe that's necessary, Your Honor, because the answer is straightforward. Under the Texas law, one avenue to receive relief is if it is a commercial establishment that invites in members of the public, and a plasma bank is certainly that. Well, this would certainly be an important issue to the state of Texas, and we don't want to get their law wrong. Do you have any legal opposition to our certifying the question? I don't believe so, Your Honor. It's not a question we've studied, but. It's a first impression question, correct? This specific issue, yes. And would it have reached beyond plasma centers, or would it only apply to plasma centers? It may have reached beyond plasma centers, depending on how you write the opinion. Okay, I want to ask something specific to plasma centers. It's different from, I understand the ordinary ADA, and I have great respect for it, so that isn't the point. But here you have an intersection with the FDA requirements around plasma that are very specific. And those requirements are that you should make sure the donor is in good health and that they should have criteria including acceptable medical history. So it's not quite the same thing as if I'm going to say that people can't come into my business because of medical reasons, that's a different, my general, my restaurant, that's a different thing. Here we have a very specific rule about plasma banks. How do those intersect, the plasma-specific rules, with the general ADA? Well, notably, Your Honor, I don't believe CSL has claimed that they were required by the FDA regulations to exclude my clients. The good health regulation provides for things like temperature, minimum weight, protein levels in the blood, having diseases that could be transferable through the plasma. It does not cover this situation specifically about anxiety or gait. But you would agree it's a little different analysis than the general rule of, like, I don't want certain people in my restaurant kind of rule, which I'm not saying I mean. Mr. X doesn't want people in his restaurant. That's the standard you discussed with Judge Elright. You would agree this FDA plasma rule is a little bit more specific? It's more specific, but it's no different than other contexts where there are regulations that apply. In the Johnson case, which we cite in the briefs, the district court was affirmed by this court, and the district court made the assessment that the FDA regime and the ADA, Title III specifically, were not in irreconcilable conflict. Thank you. And that's the case here as well. Okay, thank you. We have your argument. Ms. Nash. May it please the Court, Elizabeth Nash on behalf of the United States. The United States agrees with the appellants that plasma donation centers are public accommodations covered by Title III of the ADA. Plasma donation centers easily fit within the definition of service establishment. Ordinary dictionary definitions, as counsel has already discussed, are quite broad. Those definitions include an act of helpful activity or conduct or performance that assists or benefits someone or something. Can you discuss the intersection with the – because, again, I'm just having trouble with sort of this notion that this is just like a ring that I take to a pawn shop. I mean, this is part of a human being that's going to be put in another human being, and I just see that as different. It does not mean that the ADA doesn't apply, don't get me wrong, just saying it's different. Can you talk to me about the intersection of the FDA sort of plasma rules with the ADA general rules? Sure. So there's no conflict between the FDA regulations and ADA coverage under Title III. We know that because the FDA regulations apply to things like hospitals, which are specifically enumerated in Subsection F. So there's no inherent conflict between complying with the FDA regulations or any really complex regulatory scheme. You see that with banks, for example. They're highly regulated entities, yet they're covered by Title III of the ADA. So certainly it is the case that if the FDA were to issue a regulation that said, you know, plasma donation centers are under an obligation to defer this type of donor, which they occasionally do. So, for example, if somebody comes in and tests positive for hepatitis B, let's say, a plasma donation center could rely on that regulation to say, we're going to defer that donor from donating plasma. Coverage under Title III does not require that a plasma donation center serve every single person that enters the establishment, and it certainly gives plasma donation centers many things to think about and many things to evaluate when a donor comes in and asks for the service of, you know, plasma procurement services. So to the extent that the court is concerned about the intersection, I would say that there's no conflict there. The ADA specifically contemplates that. What about this term good health? And I'm not saying the two individuals, Silgaro and Wolff, were not in good health, but I'm just saying that term seems to encompass something a little bit more than, again, the restaurant excluding somebody or an ordinary business excluding somebody. I don't have to be in good health to go to a restaurant, in other words. Sure. So the way that the FDA regulations work is that they require plasma donation centers to establish these standard operating procedures that essentially allow the plasma donation center to make a determination about whether the person coming in to donate is in good health. So somebody might have a cold or, you know, they might be coming off of an illness or whatever it might be. So these standard operating procedures allow the plasma donation center to make that evaluation. And certainly if a plasma donation center made that evaluation and applied these eligibility criteria that they've developed, that would be evidence that the person may not be eligible to donate. And so certainly there is discretion afforded to plasma donation centers under the FDA regulations. But the question here is just whether or not there's Title III coverage. So you're saying we don't even really care about the individual circumstances of Silgaro and Wolff? Because you see it as just a ---- You're not taking a position as the United States, is that correct? That's correct. Okay. So you're not interested in the specifics. You're just saying the threshold is met. Now the specifics of whether any policy that excluded these particular people was wrong or right is for another day in your view. That's correct. Or do you have a view on it? We do not. The United States does not take a position on whether or not these particular plaintiffs were properly turned away from plasma donation. But I would say that any eligibility criteria that a plasma donation center does establish does have to be based on objective medical evidence. And it can't be based on stereotypes or generalizations about people with disabilities. So, for example, there are plenty of people with disabilities that may be in very good health. Somebody maybe who's deaf wants to donate plasma. All the United States is saying here is that if a deaf person comes into a plasma donation center and wants to donate plasma, that person has to be evaluated under the exact same eligibility criteria as every other person who enters that establishment. And that's consistent with the broad scope of the ADA. It's consistent with the department's regulations. And it's certainly something that the ADA, in contemplating that all service establishments are covered, is important for plasma donation centers to comply with. Can you help us with the same like-kind analysis that the district court performed? I'm sorry. Can you repeat that question? The district court used items in a series and determined they were the same because they weren't establishments providing a service. It's a question that Judge Chain spent some time with the plaintiff's counsel earlier. Can you please discuss it in the context of items in a series and interpretation? Sure. So this court in McGee used the canon of ad justem generis to interpret the ADA. And specifically in that case, it was sales establishment. Here, certainly, the United States agrees that this court should apply the ad justem generis canon to look at the enumerated examples in the statute to inform the definition of the broad catch-all phrase that follows at the end. But what we see here is that the 14 examples listed in the statute are quite broad. And so when we're looking to the canon of ad justem generis, we're looking for the broadest possible common trait that encompasses all 14 examples. And here, there are examples that range from funeral parlor to gas station to lawyer's office. But in every single one of them, the company provides a service for which the person pays. No. Which one? A bank. So an individual can open a savings account. But they're providing a service, and you're getting some interest, but you're paying. You pay a monthly rate, or you might get a free one if you have a certain balance. But in general, you're paying for the privilege of having that be your bank. Not always. So there are plenty of times when a person opens an account that has no monthly service fees or those fees are waived. Yeah, but the bank's making money off your money, and they're paying you less of that. That's how they make their money. So, yeah, they're being paid. Is there any other example? A hospital. So an individual who comes in to participate in a clinical trial. A hospital might pay that person to participate in that clinical trial. Simply because a hospital also provides services for which it doesn't pay people, it doesn't necessarily mean that it's not also providing services. Okay. Thank you very much. Thank you. This is the sort of case that would have taken a full day to argue, and I was on the trial court. Good afternoon, and may it please the court. Bruce Douglas and my colleague Stephanie Willing for CSL Plasma Incorporated. Your Honor, I agree with you, it could have taken a whole day to argue the case. Believe me, it took me several days to prepare for the questioning that I anticipate here, and I'll be happy to get to any of your questions. I just want to open with two, just a couple of points, if I may. And I noticed in the arguments of counsel, all very well made and well intentioned. It wasn't until Your Honor Judge Elrod finally asked the question about the statute that anyone even mentioned really the statute. We have to begin with the statute. I do want to, however, respond to a couple of points made by counsel for the United States. To say that the United States isn't really concerned with what goes on inside the plasma center, I think is somewhat disingenuous. That is exactly the opposite position that the same attorneys took when they worked for the United States in the Leverson case in the Tenth Circuit. That is exactly what is involved here. The first step is to declare a plasma collection center a place of public accommodation and then to be in a position under the discrimination provisions of 121-82 to regulate and debate what goes on in the centers. It might be useful to take just a brief moment to clarify what is the- But doesn't the U.S. already regulate under the FDA what goes on in the clinic? Well, let me try to explain it this way, Your Honor. I think that it's-and I don't want to waste the limited time I have, but let's understand what a plasma collection center is. First of all, opposing counsel likes to call it a plasma bank. It's not a plasma bank. It's not at all like a blood bank. It is regulated by the FDA and various departments of the FDA, CBER, the biologics group. In the same way as blood banks, they have pretty much the same eligibility criteria, but a plasma collection center does one thing and one thing only. It is literally the back door to a pharmaceutical manufacturing plant. CSL plasma has one function. It collects human source plasma. Source plasma is defined by the FDA regulations as human plasma that is used for further manufacturing. What is it used for? It is used to make injectable pharmaceuticals. They are known as plasma protein therapies. They treat some of the most horrific and ongoing diseases and conditions in the world, such as hemophilia, von Willebrand, anything having to do with, you know, the blood can't clot. That is what plasma is used for. Okay, what about this argument that your company is just monetizing something that would otherwise- I mean, I'm sitting here with a bunch of plasma in my body. It ain't giving me any money. And now I show up at your plasma center and I can make money on it. What about that argument? The reason that plasma centers compensate the donors for their time is because, in contrast to the blood banks, which in the United States never, to my knowledge, compensate for the time, the time differential is vast. It takes, on average, 90 minutes to two hours every time you go to the plasma center. From the time you walk in the door and you check in, do your screening, you do your waiting, and then you have to go through the plasmapheresis process, where you get on kind of a lazy boy chair. They hook you up to the machine. Your blood is drawn. It's separated from the plasma. Your blood's put back in. The plasma goes into a container in the bottom of the chair. And if everything goes according to- it puts some citrate in the- citrate and magnesia, I think, in the thing to return to your body. If everything goes well, what happens is that we collect a bottle of plasma of about 800 milliliters, so about the size of a wine bottle. Those bottles are then stored for a short period of time. They're kept frozen. They're held for about 60 days to allow for the testing of the plasma to determine its safety and integrity to the results to come back. And then if everything is okay after about 60 days, all these bottles of plasma that we collect are dumped into very large vats. They're aggregated and then sent off to the manufacturing plants around the world. Yes, of course, CSL plasma is getting the raw material to make pharmaceuticals, but that's because these pharmaceuticals are needed. The plasma proteins are needed desperately by hemophiliacs and others around the world. And the United States pays, compensates the donors and produces more than half of all the plasma in the world, and part of the reason is the Europeans don't like that. They'll be happy to take our plasma, but they don't like the fact that we compensate people for it. So they set some very strict standards as to the quality and safety of the plasma that they're getting from the United States.  Okay, let me ask this. Would it be appropriate for you to just say to all deaf people, we just don't want deaf people in our place? I mean, is it appropriate to be discriminating against people based on disabilities, even putting aside Title III? Your Honor, it would not be appropriate, and it would not be something CSL plasma would do. The short answer is CSL plasma and the other plasma collection centers, companies that make these drugs, we need all the human plasma we can get. There's a worldwide shortage of the raw material for plasma to make the therapies that these people need. Okay, but you would have thought in the 50s hotels would like all the people they could get, but they still excluded people based on race. So we know discrimination happens even when it seems contrary to business purposes. But CSL plasma is in the business of discriminating in a lawful way. We're required by the FDA to make certain... Okay, so let me ask you about that. You do see Silguero and Wolfe as mattering here. The United States is just wanting a threshold question, and that's fair. But you see this as mattering. So defend to me then and to all of us these particular rules that prohibited these particular people from giving on these particular days. Certainly. Recognizing that the district court didn't reach that question, those deferrals are not really before us, but I'll be happy to do them. Well, we can affirm on any ground.  I'll be happy to do them. Okay. So if there's a ground to affirm on, even assuming Arguendo Title III applies, these two were not improperly discriminated against, I'd like to hear it. If there's not that, that's fine. I'll be happy to address that, Your Honor. These two donors, in the case of Silguero, he was not deferred for medical reasons. He was deferred for his behavior. What happened, Mr. Silguero was a donor. He had donated on and off for a couple of years. Not regularly, but periodically, as many donors do. Even though donors can donate up to two or three times in a seven-day period, an infinitesimal number of people ever come in every week or do 100 donations a year. What happened was he was having difficulty ambulating that day. They were concerned about his ability to ambulate to get to the donor chair safely and get off the donor chair. Mr. Silguero weighed about 360 pounds at the time. They temporarily deferred him. There are all sorts of deferrals. There are temporary deferrals. For example, if you have a cold, you have a minor disease, or you've had surgery recently, there's a hundred different reasons that we defer people. Mr. Silguero didn't like that deferral. He came back the next day, and he got into it with the center manager, and he made threats. He said, you're going to be sorry, and he admits he got hot about it, and he waved his finger at her, and they said, that's it, you're deferred, you're done. Don't come back. So it wasn't a medical deferral. But this business of getting in the chair so somebody who's in a wheelchair could not donate? No. They would bring the wheelchair onto the floor and assist the person to get into it. So why couldn't they assist Mr. Silguero? I understand when he got nasty and started threatening, I understand the issue. But the day before, why couldn't somebody assist him? He weighs 369 pounds. Well, I mean, people weigh 369 pounds, and they get assisted living in memory care. The concern was before, they don't have a lift. I mean, it's not a medical facility as such. It's a commercial facility where people are just coming to donate. So they thought that they couldn't move in without him falling. And it was one of a hundred decisions made in a day. He'd been deferred before. I mean, these temporary deferrals happen all the time. He'd been deferred before. When he came back and made the threats is when they pulled the plug and said, don't come back here. Okay. Then explain Ms. Wolfe. Sure. Because that seems a little bit overbroad. Okay. Well, contrary to what opposing counsel said and what the Department of Justice might imply, the decision to defer Ms. Wolfe was made on medical evidence. In fact, what happened, she came in with her animal. And by the way, the record isn't entirely clear whether this is a service dog or a comfort animal. And comfort animals are not covered. They're not protected. They're not covered under the ADA's regulations, the Department of Justice guidelines and technical assistant manuals and so forth. DOJ would confirm that. She came in and the staff evaluated her. At each location there are medical staff associates on site. There's not always a doctor on site. The doctors come and check things out. But all the MSAs report to and work under the delegated supervision of a physician. So what happened, Ms. Wolfe comes in and the medical staff associate reaches out on the 800 number to the regional medical directors. We have three or four of them employed by CSL. They are specialists in transfusion medicine. That's a big specialty. And they reach out and call them and say, here's the situation with Ms. Wolfe. What should we do? And the doctor, a medical doctor, gets back to her, listens to the story, and makes the decision based on his experience, his professional medical judgment, having worked in the VA, having worked with patients and others who have emotional issues, that the presence of the animal in his opinion, in his professional medical opinion, was an indicator that her anxiety was so severe that there was a good possibility that she would have an episode while in the chair, lose control of the animal, and then it would be a safety issue to third parties, which is the direct threat or the safety defense under Title III. That's a reasonable medical judgment. It wasn't that somebody just said, oh, you've got a dog, we're not going to take the dog. They let service animals on the floor for blind people and others who needed to steady them. But the one thing that's clear, and the regulations promulgated by the DOJ say this explicitly, it is not the responsibility of the public accommodation, if you will, to control the animal. That is always the responsibility of the animal's handler. And so there was no evidence at the time that she could control the animal if she had an episode. We would be stuck controlling the animal. And by the way, in a plasma collection center, this may not be in the record, but to tell you, there's 50 or 60 of these chairs on the floor. And they're usually pretty busy all at one time. So she's not by herself. There's other people around. There are lots of other people around. You could fill up the well of this courtroom with plasmapheresis chairs. That's how many would be going at a given time. What is your response to the question Judge Elrod asked earlier about certifying the Texas statute to the Texas Supreme Court? I think it's unnecessary. We would not object to it if the court felt that was important. Recognizing that I think the wording of the statute is a little bit different. The Texas statute talks about a, quote, public facility, not a place of public accommodation. And I think that the Texas Supreme Court's decision in the prison case, indicating that, you know, it's a place where people may come, but they don't really have access to the whole thing. I think that the district court's decision below was sound. That the conclusion reached by the district court here that the CSL plasma center is not a place of public accommodation under 120.181.7.F is correct. And that would really hold true. The same analysis would hold true under the Texas Human Resources Code. Okay. Would you like to address the statute? Yes, I would, Your Honor. I think what we have here is this is not a new effort by my friends across the aisle, but it is the same effort to literally divorce the two words of the statute from everything else in the statute. Now, we begin, as the Supreme Court has said, and as this court has said, in McGee and other cases, we always begin with the language of the statute. If the statute is clear, our judicial task is at an end. But if the statute is not necessarily clear and requires some kind of construction, it is permissible and it is proper to use the canons of construction. The two canons of construction that were used here, I'll probably mispronounce these, adjustus minerum and nocius associ. They were used by this court in the McGee case, and they are what I would refer to as above the line canons of construction. In other words, that's part and parcel of the analysis to determine if there's an ambiguity in the statute. It's the textual analysis itself. Yes, that's correct. It's part of the textual analysis. And once you resolve that, you don't even get to legislative history, although I'll certainly grant that legislative history is intending that disabled persons have access to places of public accommodation. But merely having a broad purpose in legislation doesn't mean that every situation is governed, any more than whistleblower meant people who don't report to the SEC. That is correct, Your Honor. And I think just a quick citation, the Supreme Court this term in the Encino Motors case where they talked about the partsmen under the FLSA, and I think there was, I think Justice, I forget who wrote the opinion, it was last term, Scalia maybe, but anyway, that the liberal purpose of the FLSA does not overpower everything to the end of the earth. So back to the text. Yes. I think that there's a misconception here on the part of my colleagues across the aisle that there isn't a definition of service establishment in the statute. What we have, and I think the district court got this exactly right, the service establishment is actually defined by the list of items that come before it. And then you have the term or other service establishment. The problem with the definition that we have, the approach that the Department of Justice may take or my colleagues may take, is that virtually everything in section 12181 sub 7 is a service establishment of some kind. It serves the public. So why did Congress do this? Why does Congress have 12 different categories, which the regulation state and DOJ would agree are exhaustive, although within that the examples are just examples. Why did Congress do this and very carefully draft the statute the way they did? It's because this statute, unlike Title VII, for example, the Civil Rights Act of 1964, you know, the lunch counter cases, this statute imposes additional obligations on commercial facilities and places of public accommodation. It imposes the requirement on all commercial facilities for the elimination of architectural barriers in new construction and alterations and reconstruction. And as to public accommodations, it goes further and imposes upon it the anti-discrimination provisions. If Congress had wanted to just say a service establishment is every place, it could have said that. But it didn't. It carved them out individually, and it made it very clear that it has to be like the items that precede it. That's what the canons of construction tell us. And that's really, if one reads the statute carefully, that is exactly what the statute says. For example, subparagraph E, which says, a bakery, grocery store, clothing store, hardware store, shopping center, or other sales or rental establishment. When you think about it, those are all service establishments too. But if we take service establishment and just say any place is a service establishment, then there's no point to having the listing. Congress didn't need the listing, but Congress felt it was important to have this listing. There were some examples. These are subcategories of establishments, of which sales is a type and service is a type. That is correct. And there's a distinction, and they very carefully delineated that. They didn't just say, oh, it's every place. So why isn't this a service establishment akin to a hospital or a bank? First of all, the hospital is not a real good example, Your Honor, with respect, because hospitals are specifically listed in 121-81, Part 7. Just like in PGA v. Martin, golf courses are kind of listed here too. It's also listed, though, in the dry cleaner list too. Yeah, exactly. But hospitals are up there. So why isn't it like a bank? Why isn't it like a bank? Because we provide no service whatsoever to the donors who come in. They are providing the service to us. Did they get some sort of information about their blood? I thought that on the Internet it's advertised that it gives them a screening of some sort. The screening is done for one reason. The screening is done to determine whether or not they are healthy enough that day to donate. Do they get the information back? No, they don't. They're either told you can donate or you can't. They're not said, oh, you need to go see your doctor because this looks like you have a serious problem? No, it's not that kind of testing. They take a little finger prick of blood, and if the hemocratic count is good enough, you donate. The only time it comes in where they might call you back to tell you to go see your own health care provider is if somebody tests positive for hep C or AIDS. They call them back for a private meeting and tell them you need to go see your health care provider. Do they tell them they have hep C or HIV, or do they just say go see your doctor? No, you need to go see your health care provider. They don't give them those results. We don't provide any medical care to anybody at the center. The whole purpose of this center, and if we could, we would locate the collection center at the back of the factories, but the factories are few and far between, and the plasma is shipped all over the world to get there. Someday maybe somebody will come up with synthetic plasma, and this whole thing will go away, and then no one else is going to step into the breach to extract plasma. That is a fanciful idea that we're providing the service of extracting plasma. Nobody needs their plasma extracted. The other thing I would, you know, questions. Your time is up. Thank you. Thank you. Your Honor, a few points if I may. I'd like to directly address the question about the statutory interpretation. Congress gave the list in order to demonstrate the incredible breadth of coverage here. There are more than 50 entities listed. There's 12 categories that are meant to be construed liberally to approve people with, to afford people with disabilities equal access to the wide variety of establishments available to the non-disabled. That's binding precedent from PGA TOR, and PGA TOR also says, or indicates that the relevant question is whether coverage is inconsistent with the literal text of the statute. The literal text of the statute here says service establishment, and plasma banks definitely provide services. Well, we've been struggling whether or not they provide a service to the person who comes in or not. We've had a whole series of questions about that. So it's not abundantly clear that by the plain meaning of service and establishment that they're covered. The question is, are activities happening that assist people and benefit them? That's what the definition. The people who come in. The people who come in unambiguously receive a benefit as a result of donating plasma, whether they're doing it for altruistic reasons or more commonly for monetary reasons. That is a definitive benefit. In terms of the direction of payment, that question and whether that's a common theme, it is not. A bank is paid in the same way that has a free checking account or a free savings account. It's paid in the same exact way as a plasma bank is by leveraging essentially the deposit, whether it's money in the bank's case or the deposit of plasma in the plasma bank's case. It's getting paid off that deposit and leveraging that deposit and not receiving direct monetary payment from the customer. Neither does legal aid. Neither do public defenders. Neither do free medical clinics. All of those are clearly service establishments within the express meaning of the statute. Other establishments also deal with the human body and provide services. Hospitals and doctors clearly do. Bragdon v. Abbott. Yeah, but I think if I go to a doctor and I get treated for being sick that, yes, I'm getting a service. That's the same thing as having them take plasma out of me or my kidney or some other part of me. My only point is, Judge Haynes, that if these were activities that occurred in a medical office, they would obviously be considered to be medical services just as CSL represents and provides medical services. Well, the problem is that we're defining the establishment. And once the establishment is providing services, if the bank's providing services but they also do, a lawyer, for example, is charging 90 percent of their clients but then they also do pro bono, that doesn't suddenly make them not a service establishment. I understand that. But that isn't what we have here. Right. And to that point, I just want to point out again that legal aid or public interest law firms that do not take payment as a rule are covered, which indicates that direction of payment is not what Congress was concerned about. What also indicates that direction of payment is not what Congress is concerned about. Yeah, but, I mean, legal aid isn't paying the client either. Well, banks do pay their clients. And the idea that Congress was concerned about direction of payment is undermined completely by the rest of 12-181-7, which lists an array of establishments that Congress wanted to secure access to, including museums and libraries and homeless shelters, organizations where there is no transaction at all. But doesn't that cut the other way, where Congress wanted to identify groups where there is no payment going that way, the Congress listed them. The list that Congress provided. Congress chose to list museums, et cetera. The list that Congress provided is not exhaustive. So it provided entities to demonstrate the sheer breadth, and this court in Frame v. Arlington talked about that breadth as a broad mandate of comprehensive character that's aimed at eliminating discrimination in all aspects of society. But it talked generally about the point of the ADA. Okay, but I just think that's something to think about. Could you please address, I know your time is up, but other than saying that you're not in favor of going to the Texas Supreme Court, but you don't have a legal objection, we didn't talk about 121.0025 at all, really. And I'm wondering what do you do with the district court's analysis that this is not a combination to the person coming in? Well, it is a commercial establishment that invites in the general public, which is also part of the statute. The district court focused on whether the Plasma Bank meets the convenience or a need. Do you agree that it doesn't? I don't agree that it doesn't. I believe it meets a need. In the circumstances that Mr. Soguero is in, he needed to go to a plasma bank in order to convert his plasma, take advantage of the service of having something that's not worth anything converted into something that is worth something. That is a service, it is the same as what a recycling center does, essentially. It's not that different from what a commercial bank does. When you use your deposit and you earn interest off that deposit. There are some factual issues that I briefly, briefly want to hit. And I want to point out just, Your Honor, I'm sorry, but the Soguero behavior issue, whether he shouted at the person, that is a fact that is contested. And it's also, we briefed it out completely. There were several factual issues that were raised by counsel. You stand on your brief and you believe there are fact issues that keep us from being able to decide on the merits. Is that your position? Yes, Your Honor. And with Ms. Wolfe, there was nothing in the record. And we demonstrate that Dr. Nelson's testimony did not contain any actual evidence that this policy about service dogs and anxiety was medically supported at all. Okay, your time has expired, counsel. Thank you very much. We have all the arguments. Thank you for your indulgence, Your Honor. And this case is submitted and we will stand in recess until tomorrow morning when we will hear additional cases. Thank you.